**McCUTCHEON et al. v. WOZENCRAFT, Mayor, et al. (No. 386-3675.)**

(*Commission of Appeals of Texas, Section B. Nov. 21, 1923.*)

**1. Municipal corporations ⬦683(1)—Right to run busses on streets held a "franchise" within provision for referendum.**

The right to run motor busses for hire upon the city streets is a "franchise" within the meaning of a charter provision requiring the board of commissioners to submit ordinances granting such franchises to popular vote when petitioned by 500 voters.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Franchise.]

**2. Municipal corporations ⬦680, 681(1)—City may grant license to use streets.**

A municipality has the right by ordinance to grant a license for conducting any lawful business upon the streets which would tend to public comfort and would not unreasonably impair their dedicated use.

**3. Municipal corporations ⬦108—City attorney's approval of submission of franchise ordinance unnecessary to require submission.**

Under the referendum provision in the Dallas charter, the right to have an ordinance granting a franchise submitted to the voters was not defeated because the city attorney did not draw the ordinance and had disapproved of its submission.

**4. Mandamus ⬦187(4) — Charter provision not construed when not pleaded.**

A charter provision contended to invalidate a proposed ordinance, but not pleaded in proceeding for mandamus to compel its submission to the voters, cannot be construed.

**5. Municipal corporations ⬦111(4) — Invalid provision could not invalidate whole ordinance providing otherwise.**

Under a section of an ordinance providing that the declaring of any section unconstitutional or unlawful should not vitiate the rest of the ordinance, another provision that no compensation should be paid for 3 years for the enjoyment of a franchise, even if illegal, could not invalidate the remaining sections.

**6. Municipal corporations ⬦108 — Franchise ordinance for busses could be submitted to voters, though fixing maximum fare.**

Though an ordinance fixing rates payable by public utilities could not be presented to electors for adoption under the Dallas charter, an ordinance granting a franchise to motor busses and limiting the maximum fare within the city to five cents was not objectionable, since the city retained power to regulate the price below five cents and such provision could at most only be declared void when attempt was made to increase the rate.

Error to Court of Civil Appeals of Seventh Supreme Judicial District.

Action for mandamus by Currie McCutcheon, and others against Frank Wozencraft,

Mayor, and others. From a judgment of the Court of Civil Appeals (230 S. W. 733) affirming the judgment of the district court, which sustained a general demurrer to the petition, plaintiffs bring error. Reversed and remanded to the district court, with instructions.

McCutcheon & Church, of Dallas, for plaintiffs in error.

Jas. J. Collins, City Atty., and Allen Charlton and Carl B. Callaway, Asst. City Attys., all of Dallas, for defendants in error.

McCLENDON, P. J. This was an action for mandamus by Currie McCutcheon and others, whom we will call relators, against Frank Wozencraft, mayor of the city of Dallas, and the several commissioners of that city in their official capacity, whom we will call respondents, to compel the latter to submit to the electors of the city at the next general city election a proposed ordinance granting to relators a franchise for the period of 20 years to operate over the streets of the city motor bus lines for the transportation of passengers for hire between points within the city and interurban bus lines and to maintain a downtown interurban station. The trial court sustained a general demurrer to relators' petition and dismissed the suit. This judgment was affirmed by the Court of Civil Appeals, 230 S. W. 733.

The controlling question in the case is whether the rights sought to be acquired by relators under the proposed ordinance constitute a franchise within the meaning of the city charter, which requires the commissioners under certain conditions to submit the granting thereof to the electors; or whether, as held by the trial court and the Court of Civil Appeals, they constitute merely a license or other privilege short of a franchise, the granting of which was exclusively within the power of the commission.

Relators' petition is carefully drawn, and fully sets forth in detail the charter powers, the proposed ordinance, and the various steps taken to secure its submission to popular vote. The following statement, gleaned from the petition, will suffice, we think, to a clear understanding of all the questions presented:

The charter provisions of the city which relate to the matter in hand read:

Art. II, Sec. 8, Subd. 1.—The ownership right of control and use of the streets, highways, alleys, parks, public places and all other real property of the city of Dallas is hereby declared to be inalienable to said city, except by ordinance passed by vote of the majority of the board of commissioners, as hereinafter provided; and no franchise or easement involving the right to use the same, either along, across, over or under the same, shall ever be valid, unless expressly granted and exercised in compliance with the terms hereof, and of the ordinance granting the same. No act or omis-

sion of the city, its board of commissioners, officers or agents shall be construed to confer or extend by estoppel or direction, any right, franchise or easement, not expressly granted by ordinance; provided, that alienation of school property shall be as herein elsewhere authorized.

2. The city of Dallas shall have the power, subject to the terms and provisions hereof, by ordinance to confer upon any person or corporation the franchise or right to use the property of the city, as defined in the preceding section, for the purpose of furnishing to the public any general public service, including heat, light, power, telephone service, refrigeration, steam, or the carriage of passengers or freight within said city and its suburbs, over the streets, highways and property of said city, or for any other purpose whereby a general service is to be furnished to the public for compensation or hire, to be paid to the franchise holder, whereby a right to, in part, appropriate the streets, highways or other property of the city, is necessary or proper; provided, that no franchise shall be granted by said city to any person, firm or corporation to own, control or operate waterworks therein.

4. The city of Dallas shall have the power by ordinance to grant any franchise or right mentioned in the preceding sections hereof, which ordinance shall not be passed finally until its third and final reading, which reading shall be at three separate regular meetings of the board of commissioners, the last of which shall take place not less than thirty days from the first. No ordinance granting a franchise shall pass any reading except by a vote of the majority of the board of commissioners, and such ordinance shall not take effect until sixty days after its adoption on its third and final reading; provided, however, that if at any time before such ordinance shall finally take effect a petition or petitions shall be presented to the board of commissioners signed by five hundred of the bona fide qualified voters of the city, then the board of commissioners shall submit the question of the granting of said franchise to a vote of the qualified voters of the city of Dallas at the next succeeding general election to be held in the city, provided that notice thereof shall be published at least twenty days successively in a daily newspaper published in said city prior to the holdings of said election. * * * In case a franchise is refused by the board of commissioners then the matter may be submitted to the qualified voters on petition, as hereinbefore provided, and a failure to finally pass on an application within six months after the filing of such application shall be construed as a refusal. The board of commissioners in passing an ordinance granting a franchise may provide therein that it shall not take effect until the same shall have been submitted to and approved by a majority of the qualified voters voting thereon at a general election.

We have omitted, as unimportant here, the portions of the charter regarding the manner of holding the election.

The proposed ordinance provided in substance that the relators, their legal representatives, and assigns were granted, for the full term of twenty years from the date of the taking effect of this ordinance, the right, privilege and franchise to have, acquire, maintain, own, use and operate in the city of Dallas a motor bus system and transportation lines and such extensions to such system and lines and additions thereto and new lines and changes in the existing system and lines, as shall hereafter be made, and to have the right to use, operate and maintain said motor bus system and lines in, over, under, along and across the present and future streets, highways, alleys, bridges, viaducts and public ways of the city of Dallas. All rights granted were to be subject to and governed by the city charter. Grantees were required at all reasonable times to keep open for inspection by the commissioners their books and records. They were not to charge in excess of five cents for one continuous passage within the city between the termini on any line. Default of the grantees in any of their obligations gave the city the power to forfeit the rights granted under prescribed procedure. As compensation for the rights granted the grantees were to pay to the city annually a bonus of 4 per cent. of the gross receipts of the business done within the city limits.

"Said bonus shall be due and payable on the 15th day of February of each year for the preceding calendar year and such bonus shall be exclusive of and in addition to all ad valorem taxes. However, this bonus shall not start and the grantees shall not be liable therefor until the 3 years as provided for under article II, section 8, subd. 6, of the charter of the city of Dallas and the amendments as adopted in 1914 shall have elapsed."

Relators were to form a corporation within six months of the taking effect of the ordinance to take over the rights granted. A schedule of designated routes to be operated within the city was attached to the proposed ordinance and provisions made for modifying or extending existing routes or acquiring new routes. Section 17 of the proposed ordinance provided:

The declaring of any section or portion of this ordinance unconstitutional or in violation of the state law or city charter shall not affect the remaining sections or portion of this ordinance.

The proposed ordinance was duly presented to the board, together with a petition for its submission to the electors, signed by 908 qualified voters. It was referred by the board to the commissioner of finance and revenue, who reported that he had referred it to the city attorney's department on the legal duty of the board in the matter of granting the petition, which department had rendered an opinion that neither the board nor the electors had authority to grant a franchise for 20 years to conduct an automobile bus line for hire. This report was adopted by the board and the petition declined.

The writ of error was granted on the ground of apparent conflict with Greene v. San Antonio (Tex. Civ. App.) 178 S. W. 6.

[1] The holding of the Court of Civil Appeals, which follows the holdings in Dallas v. Gill (Tex. Civ. App.) 199 S. W. 1144, and Lindsley v. Street Ry. Co. (Tex. Civ. App.) 200 S. W 207, is based upon the proposition that the right to run motor busses for hire upon the streets of a city does not come within the meaning of the word "franchise" as used in the city charter, but more properly falls within that class of public privileges known as "licenses," and could be granted only in accordance with general ordinances under the police powers of the city regulating the use of the public streets.

We have reached the conclusion that the rights sought in the proposed ordinance do properly come within the meaning of franchise as used in the city charter and that the respondents were under the duty to grant the petition and submit the proposed ordinance to the electors.

The question of what is, and what is not, a franchise has been frequently before the courts of this country and England, and has given rise to much diversity of view. Blackstone defines a franchise as "a royal privilege, or branch of the king's prerogative, subsisting in the hands of a subject." The right to exist as a corporation, which could only be acquired originally in England under grant from the crown, has always been held to be a franchise. In view of the fact that the powers exercised by public service corporations, such as the right of eminent domain, the right to use and occupy public thoroughfares and to collect tolls for public service rendered, are derived from the charters of such corporations which have their origin in the state through legislative enactment, it is held in some jurisdictions that the privileges granted by a municipality to such corporations to use the streets for the purposes authorized in the corporate charter are not franchises, but are merely licenses, easements, or rights of way. And this holding is a logical deduction from the original definition of the term franchise. However, it is not in accord with the great weight of authority in this country, and was clearly not the meaning given to "franchises" in the charter of the city of Dallas, for in that event there could hardly be a franchise which the city could grant in the use of its streets, the exercise of which would not be limited to private individuals.

By the great weight of authority in this country, the grant of the right to use the public streets of a city in conducting the business of furnishing transportation for hire by means of street railways and of furnishing service by water, gas, telegraph, telephone, electric, steam, and heat companies, etc., are held to be public franchises, and not merely licenses, easements, or rights of way.

This subject is ably treated in McQuillin on Municipal Corporations, vol. 4, § 1613 et seq. That author, quoting from the preface to Wilcox on Municipal Franchises, says:

"Municipal franchises are the concrete, definite points of contact between large public and large private interests. * * * Franchises have been regarded as special privileges granted by the government to particular individuals or companies to be exploited for private profits. They are coming to be regarded, however, not so much as privileges, but rather as functions delegated to private individuals to be performed for the furtherance of the public welfare and subject to public control."

To quote from McQuillin:

"The idea in early days that franchises were of little value has changed, largely because of the phenomenal growth of American cities, so that now, instead of giving away franchises without consideration, the tendency is to protect fully the interests of the municipality, both for the present and the future, and to preserve the right to regulate the operations of the grantee of the franchise, for the protection of the municipality and its inhabitants against the possible greed of the grantee, arising from its having a monopoly.

"Formerly, the right to grant franchises to use the streets was to a large extent withheld from municipalities and vested in the Legislature, which could grant the use of streets without the consent of the municipality and without compensation; but the tendency of modern legislation is to delegate to the local authorities the exclusive dominion over the streets of the respective municipalities, and the value of local self-government in this respect is self-evident, except perhaps where the public utility is one in which the municipality is only incidentally interested, because only a very small part of its operations are within its boundaries, as in the case of an interstate telegraph company. Volume IV, pp. 3356, 3357."

The charter provisions above set out are in line with the policies announced in these quotations. They go even a step further, and recognize the interest of the electors themselves in granting or withholding privileges which so vitally affect their welfare.

[2] That every one has the right to use the public streets for vehicular traffic of all kinds, subject, of course, to reasonable regulation, is not open to question. This does not mean, however, that one has the inherent right to use the public thoroughfares for the purpose of conducting thereon the business of a common carrier for hire. It may be that without prohibitory legislation this could not be prevented, and in that sense in the absence of such legislation the right may be said to inhere in every one to use the public thoroughfares for this purpose. In this state municipalities are generally given control over public thoroughfares within their territorial limits, and in the exercise of this control a municipality has the right by ordinance to grant a license for conducting any lawful business upon the streets which

would tend to public comfort or convenience and would not unreasonably impair the use of the streets for the purposes of their dedication. The granting of such a right by ordinance, which could be exercised by any one complying therewith, would be an exercise of the police powers of the city. The right thus granted would ordinarily constitute a license and would be subject to regulation and revocation by the city. There is a marked distinction, however, between the right thus granted and the right to use definite or designated portions of the public thoroughfares, such as is acquired by street railways and water, light, heat, power, gas, steam, and other similar enterprises, and this distinction is now well recognized in the jurisprudence of this country; the latter class of rights being very generally held to be franchises. As stated above, in some jurisdictions a contrary view is taken. This is especially true in Illinois. In this connection the case of McPhee v. Railway, 158 Fed. 5, 87 C. C. A. 619, might be cited. The opinion in that case contains a very able discussion of the subject and review of the authorities, for which purpose alone it is cited.

The only substantial difference between the right to operate motor busses for hire over designated routes in a city and collect tolls therefor and the right to operate street cars or conduct other public service enterprises enumerated above is that in the latter class of rights the grantees therein, in a sense, physically appropriate certain portions of the public thoroughfare for constructing therein their tracks, pipes, and poles, whereas in the case of motor busses there is only the use of the streets by the vehicles employed in the business. This distinction, however, we think, is more fancied than real. The motor vehicle has been so rapidly and highly developed in the last 20 years that it constitutes one of the most important factors in our everyday life. In some localities the motor bus has supplanted in a large measure the street car, and it may be seriously questioned whether in the economic development of the future the latter may not eventually be discarded altogether or reduced to a much more restricted use. This is already true in some of the European cities, notably London. That the public are vitally interested in this character of transportation is self-evident, as much so, in any event, as they are in transportation by street cars. The burden upon the public thoroughfares may easily become as onerous as the use of the street car upon a designated portion of the streets over which they operate, and without regulation might become more so. This fact was adverted to in Greene v. San Antonio, and, while in that case the distinction between a franchise and a license may not have been controlling, the grant to use the streets for motor bus passenger traffic was held to be a franchise. The same conclusion was reached in the case of Fifth Avenue Coach Co. v. New York, 194 N. Y. 19, 86 N. E. 824, 21 L. R. A. (N. S.) 744, 16 Ann. Cas. 695. In that case, the Fifth Avenue bus line, a familiar object to every one visiting New York City, was held to be a franchise. Originally that line appears to have been a horse-drawn stage line and was later converted into the modern double decked bus line. It serves the same purpose as the street car, operates over streets upon which tracks are not permitted to be laid, and is of the same vital interest to the public that a street car line would be.

We do not read in the language of the charter any expressed intention that the right of appropriation of a designated portion of the street must, in order to constitute a franchise, be accomplished by placing therein the physical property of the grantee. The placing of tracks in a street does not exclude the public from the use of the portion of the thoroughfare occupied by the tracks. The public are only excluded therefrom by and to the extent of their use by the cars that pass over them. That this use is restricted to the space occupied by the tracks is unimportant. The same burden, as above stated, is imposed upon the street by the use of motor busses operating over designated routes.

The proposed ordinance provides for a number of these routes, and evidently contemplates a comprehensive system of transportation throughout the city. In order to accomplish this design it is quite evident that some degree of permanency should attach to the rights under which it is sought to be carried out. Large capital would be required for the venture, and this could hardly be obtained under the precarious authority of a revocable license. The charter specifically gives the electors the right to grant or withhold franchises which appropriate portions of the street for the purpose of transportation for hire, and we can see no reason which would apply this right to a street railway enterprise that would not as forcefully apply it to a comprehensive system of transportation by motor busses.

Our conclusion is that the proposed ordinance sought a franchise within the meaning of the city charter and should have been submitted to the electors.

Respondents have interposed some further objections to the proposed ordinance, claiming it to be illegal. None of these objections, we think, are sound.

[3] It is contended that mandamus will not lie to compel the submission of the proposed ordinance to the electors because it was not drawn by the city attorney nor approved by him as provided in the charter. The charter provision referred to clearly has no application to an ordinance which is sought to be submitted to the electors upon petition of the

required number of voters. As stated above, the ordinance was in fact submitted to the city attorney's department, and that department held that it was not a proper subject for submission to the electors. The right to have the proposed ordinance so submitted could not be defeated in this manner. The petitioners complied with every requirement necessary to obtain an election upon the subject, and the charter made it the duty of the board under these circumstances to submit the proposed ordinance to the electors. It had no discretion in the matter. The demand of the petitioners could not be defeated by any action or nonaction on its part or on the part of any other city official. Greer v. Hunt County (Tex. Com. App.) 249 S. W. 831.

[4, 5] It is further urged that the proposed ordinance was invalid in that it provided that no compensation would be paid the city for the first 3 years, in violation of article IV, § 8, subd. 2, of the city charter. That provision of the charter is not embraced in the pleadings in the case, and for that reason we are not authorized to construe it. However, even assuming that the provision in question is in conflict with the charter, that fact would not, under provision 17 of the proposed ordinance above quoted, vitiate the proposed ordinance as a whole.

[6] The only other contention worthy of notice is that it provides for the fixing of rates for transportation, which is a matter that cannot be determined by the electors under the holding in Telegraph Co. v. Dallas, 104 Tex. 114, 134 S. W. 321. Aside from the fact that, if invalid, this provision of the proposed ordinance would fall under section 17 above quoted, we think there is no merit in the contention. The only provision in the proposed ordinance affecting rates of transportation is that which limits the maximum amount of fare within the city to five cents for a continuous passage. This is a regulation only in the sense that the relators are denied the power to advance the fare above the maximum. To the city is left the power to control the rates below that figure. Only the relators could complain of this provision, and at most it could only be declared void whenever an attempt was made by the relators to obtain from the city a rate in excess of this maximum under proper hearing and showing. See Uvalde v. Electric Co. (Tex. Com. App.) 250 S. W. 140.

We conclude that the judgments of the district court and Court of Civil Appeals should be reversed and the cause remanded to the former for further proceedings not inconsistent with the views above expressed.

CURETON, C. J. Judgments of the district court and Court of Civil Appeals reversed, and cause remanded to the district court for further proceedings not inconsistent with the opinion of the Commission of Appeals.

GREENWOOD, J., not sitting.