In the

# United States Court of Appeals
## For the Seventh Circuit
_____

No. 16-1008

JOE SANFELIPPO CABS, INC., *et al.*,

*Plaintiffs-Appellants*,

*v.*

CITY OF MILWAUKEE,

*Defendant-Appellee*,

*and*

JATINDER CHEEMA and SAAD MALIK,

*Intervening Defendants-Appellees*.

_____

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:14-cv-01036-LA — **Lynn Adelman**, *Judge*.

_____

ARGUED SEPTEMBER 19, 2016 — DECIDED OCTOBER 7, 2016

_____

Before POSNER, WILLIAMS, and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*. The issue presented by this appeal, as by the similar appeal in *Illinois Transportation Trade Association, et al. v. City of Chicago, et al.*, Nos. 16-2009, 16-2077 &

16-2980, also decided today, is whether the Fifth Amendment's prohibition against the taking of private property for public use without just compensation forbids Milwaukee, in this case, and Chicago, in the parallel case, to allow competition with established taxi services in the city, whether from new taxi companies (in Milwaukee) or from companies that provide close though not identical substitutes for conventional taxi services, such as Uber Technologies, Inc. (better known just as "Uber") (in Chicago).

The intervenors, who support Milwaukee's opposition to the plaintiffs' claims, obtained taxi permits under a new Milwaukee ordinance that is the target of the plaintiff-appellant taxi companies; they could not have afforded to buy taxi permits under the old ordinance that the plaintiffs wish to see reinstated. The district judge dismissed the plaintiffs' suit on the pleadings, precipitating the appeal and the filing of a brief in opposition by the intervenors, which need not be discussed separately however because it differs from Milwaukee's brief only in that the intervenors are intensely suspicious of the City's bona fides and fear it will revert to the old ordinance. Suspicion alone can't support a legal claim, but the intervenors were the plaintiffs in the state-court case that held that the permit cap violated the Wisconsin constitution, and the district court reasoned that if Milwaukee's new ordinance was found to be a taking, this would be in conflict with the state court's decision. As we'll see, there's no conflict.

From 1992 to 2013, a Milwaukee city ordinance (a component of Wisconsin state law, because Milwaukee's local government is part of the state government) limited the number of taxicab permits in the city to the number in exist-

ence on January 1, 1992, that were renewed. No new permits would be issued; and although permits could be sold, this would not increase the number of permits. Since not all taxicab permits are renewed, the effect of the ordinance was not only to place a ceiling on the number of permits but also to lower the ceiling over time by virtue of the nonrenewals; the number of permits could not increase, because no new permits could be issued, but it decreased every time a permit was not renewed. By 2013 the number of permits (equal to the number of cabs) had diminished from about 370 to about 320, and as a result the price of permits on the open market (for remember that while no more permits could be issued, existing permits could be sold) soared as high as $150,000. (We don't know what the average price was just after the 1992 ordinance.)

In 2013, after a lawsuit successfully challenged this permit-cap ordinance as a violation of the equal protection and substantive due process clauses of the Wisconsin state constitution, the City experimented with conducting a lottery offering as prizes 100 brand-new taxicab permits to be issued by the city. The lottery attracted 1700 permit seekers, which suggested that the market was believed to be underserved. There were other indications that as a result of the 1992 ordinance there was a taxi shortage. Milwaukee had in fact only one taxicab per 1850 city residents, a much lower ratio than comparable cities. See Bruce Vielmetti, "Cab Drivers to Sue Milwaukee over Limit on Permits," *Milwaukee Journal Sentinel*, Sept. 26, 2011, archive.jsonline.com/news/milwaukee/130609278.html.

The City responded to the shortage the following year (2014) by taking the lid off the number of permits that the

city would issue. Now a new permit would be issued to any qualified applicant. The shortage flagged by the lottery attracted not only permit applicants, theretofore barred since 1992, but also substitutes for conventional taxicab service, such as Uber. The combination of new taxi permittees and taxi substitutes (sometimes called "ridesharing" companies, more precisely app-based such companies) such as Uber and Lyft diminished the profitability of the existing taxi companies, which had faced little competition under the ancien régime. Indeed that regime had created an oligopoly of taxi service in Milwaukee. The theory of oligopoly teaches that the fewer the number of competitors in a market, the less vigorously they are likely to compete, preferring to share the profits than to fight with each other. In other words they collude, though tacitly to avoid attracting the attention of the antitrust agencies.

The plaintiffs' contention that the increased number of permits has taken property away from the plaintiffs without compensation, in violation of the constitutional protection of property, borders on the absurd. Property can take a variety of forms, some of them intangible, such as patents. But a taxi permit confers only a right to operate a taxicab (a right which, in Milwaukee, may be sold). It does not create a right to be an oligopolist, and thus confers no right to exclude others from operating taxis. An excellent amicus curiae brief filed by Reason Foundation offers the hypothetical example of a city government that "issued a license to the first grocery store or gas station in a growing town. Years later, after the population had grown, other individuals applied for licenses to create competing grocery stores and gas stations to better serve the needs of the expanding market. … Ultimately, the pressure for additional services might drive the City

to issue additional licenses," thus breaking the monopoly of the initial, single licensee. "It would be absurd for the incumbent owners of the sole grocery store and gas station to assert a property right in the monopoly value of their businesses and claim a 'taking' for any reduction in secondary market value due to the newly-issued licenses, just as it would be absurd to claim a taking for reduced profits resulting from increased competition." (The term "primary market" in the preceding sentence refers to the issuance of the licenses, "secondary market" to the resulting competition among the licensees, which is to say the taxi companies, including however the app-based ridesharing companies.)

We might have a different case had the city contractually obligated itself to freeze taxi permits for 50 years in order to encourage the taxicab owners to improve their equipment, work harder, and hire better drivers. But it did not do that. The no-new-permit ordinance of 1992 froze taxi permits (indeed made it inevitable that their number would shrink over time), but only for as long as the ordinance remained in effect—and it could be repealed at any time because it had no fixed duration. The plaintiffs cite statements by Milwaukee aldermen that they allege understood the 1992 ordinance to be creating a property interest in the permits' value, but other aldermen warned that the ordinance could be changed to the disadvantage of the taxi companies. The companies were thus on notice that there was no guarantee that the ordinance would remain in force indefinitely, and they must also have known that were it repealed they would be faced with new competition that would threaten their profits.

The city gave them no protection against such an eventuality. The ordinance gave them no property right, and its re-

peal therefore invaded no right conferred on them by the Constitution. See *Minneapolis Taxi Owners Coalition v. City of Minneapolis*, 572 F.3d 502, 508–09 (8th Cir. 2009); David K. Suska, "Regulatory Takings and Ridesharing: 'Just Compensation' for Taxi Medallion Owners?" 19 *Legislation & Public Policy* 183, 198–201 (2016). Apropos is Holmes's remark in his famous opinion in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922), that "government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." The taxi permits issued by the Milwaukee city government are property, but have not been "taken," as they do not confer on the holders a property right in, amounting to control over, all transportation by taxis and taxi substitutes (such as Uber) in Milwaukee.

Undoubtedly by freeing up entry into the taxi business the new ordinance will reduce the revenues of individual taxicab companies; that is simply the normal consequence of replacing a cartelized with a competitive market. But the plaintiffs exaggerate when they predict ruination for themselves. Buses and subways and livery services and other taxi substitutes have not destroyed the taxi business; nor has Uber or Lyft or the private automobile or for that matter the bicycle. Taxicabs will not go the way of the horse and buggy—at least for some time.

We have one more set of issues to discuss, though very briefly. The plaintiffs' complaint includes claims under state law as well as under federal constitutional law, claims thus within the supplemental jurisdiction of the district court, which decided to decide them rather than relinquish them to the Wisconsin state courts, as it could have done. See 28

U.S.C. § 1367. The claims are of breach of contract, promissory estoppel, and equitable estoppel. The district judge rejected all three, pointing out that ordinances are not contracts, let alone perpetual contracts; that there was no promise by the City never to rescind or amend the 1992 ordinance and so no contract and no promise, or reason for the taxi companies to believe, that the ordinance would continue *in perpetuo*, unaltered. He was right on all counts.

The parties raise additional issues, but none that has sufficient merit to require discussion. The judgment of the district court, rejecting the plaintiffs' claims, is

AFFIRMED.