**THIRD DIVISION**
**DILLARD, P. J.,**
**GOBEIL and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received*** **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**February 20, 2020**

# In the Court of Appeals of Georgia

A19A2394. ATLANTA METRO LEASING, INC. et al v. CITY OF
    ATLANTA.

HODGES, Judge.

Atlanta Metro Leasing, Inc. and Checker Cab Co. (collectively, the
"Appellants") appeal the trial court's order granting the City of Atlanta's (the "City")
motion to dismiss their complaint. The crux of this appeal is whether the City's
issuance of taxicab Certificates of Public Necessity and Convenience ("CPNC"s)[1] and
City permits created municipal franchise agreements and, if so, whether the City
breached any such agreements by failing to enforce taxicab regulations against
personal transportation network companies ("TNC"s), such as Uber and Lyft. These
are questions of first impression in Georgia and appear to be fairly novel arguments

---

[1] A CPNC is commonly known as a "medallion" in many foreign jurisdictions.

in other jurisdictions as well. Based on the following reasons, we affirm the trial court's dismissal of the Appellants' complaint.

It is well settled under Georgia law that a trial court is authorized to dismiss a complaint under OCGA § 9-11-12 (b) (6) for failure to state a claim where the complaint lacks a legal basis for recovery. See *Hill v. Bd. of Regents of the Univ. System of Ga.*, 351 Ga. App. 455, 458 (1) (829 SE2d 193) (2019). A complaint lacks a legal basis for recovery if

> (1) the allegations of the complaint disclose with certainty that the claimant would not be entitled to relief under any state of provable facts asserted in support thereof; and (2) the movant establishes that the claimant could not possibly introduce evidence within the framework of the complaint sufficient to warrant a grant of the relief sought.

(Citation omitted.) *Villa Sonoma at Perimeter Summit Condo. Assn. v. Commercial Indus. Bldg. Owners Alliance*, 349 Ga. App. 666, 667 (1) (824 SE2d 738) (2019). In considering dismissal under OCGA § 9-11-12 (b) (6), the trial court "must accept as true all well-pled material allegations in the complaint and must resolve any doubts in favor of the plaintiff." (Citation and punctuation omitted.) *Hill*, 351 Ga. App. at 455. "This court reviews a trial court's ruling on a motion to dismiss de novo, viewing as true all well-pleaded material allegations in the complaint. However, we

2

are under no obligation to adopt a party's legal conclusions based on these facts." (Citations and punctuation omitted.) *Villa Sonoma*, 349 Ga. App. at 667 (1).

So viewed, the Appellants' amended complaint alleges that in 1977, the City passed a vehicle for hire ordinance regulating the taxicab industry in the City. Pursuant to that City ordinance, taxicab companies, such as the Appellants, are required to possess two items to operate lawfully in the City: a CPNC and a permit issued by the City. The City authorized 1,600 CPNCs, which have risen in value from $100 when they were first issued in 1977 to approximately $80,000 by 2014. Atlanta Metro Leasing is the owner of approximately 140 CPNCs. Checker Cab possesses a taxicab permit issued by the City and utilizes Atlanta Metro Leasing's CPNCs.

According to the Appellants' amended complaint, property rights are associated with CPNCs, such that they could be leased, transferred by bequest, assigned, and pledged as collateral. Therefore, the Appellants conclude that the City's issuance of CPNCs and taxicab permits constitute the entry of the City into municipal franchise agreements. The Appellants further conclude that although CPNCs are designated in the City ordinance as "licenses," both the CPNCs and taxicab permits "were in substance implied in fact contracts." To that end, the Appellants allege that

3

[a]n essential consideration provided by the City to the purchasers of the CPNCs [and permits] under these municipal franchise agreements and implied in fact contracts was the feature of exclusivity, i.e. that the city would take reasonable measures to enforce the ordinance such that unlicensed taxicab businesses in the City would be curtailed and minimized and CPNC values would be protected from diminution arising out of unlawful competition.

Beginning in 2012, various TNCs began operating in the City without CPNCs or taxicab permits. These rideshare companies connect passengers with drivers through smartphone applications. The Appellants allege that TNCs operated as unpermitted taxicab companies in the City. According to the Appellants, although the City initially issued citations to TNC drivers for violation of the City taxicab ordinance, at some point in 2014, "the City, acting through the Mayor's Office, the Law Department and the Police Department made a deliberate policy decision to stop enforcing the law and to not issue any further citations to Uber, Lyft or similar companies or to their drivers." In December 2014, the Atlanta Taxicab Company Owners Association, on behalf of Checker Cab and other taxicab companies, made a written demand on the City to enforce the taxicab ordinance against Uber and Lyft, but the City refused.

In 2015, the Georgia General Assembly passed House Bill 225, which became effective July 1, 2015. This bill preempted local government regulation over portions of the vehicle for hire business and provided a legal basis for TNCs to operate in the City as vehicles for hire. The bill, however, did not include Hartsfield Jackson Atlanta International Airport, and, according to the amended complaint, the City failed to address any illegal operations of TNCs at the airport. It was not until 2016 that the City enacted an ordinance providing authorization for TNCs to operate at the airport.

The Appellants sued the City, seeking damages for breach of contract regarding the CPNCs and permits from 2014 until July 1, 2015, in the City and from 2014 until 2016 at the airport, as well as bad faith expenses under OCGA § 13-6-11. According to the Appellants, the City's failure to enforce its taxicab ordinance against TNCs resulted in substantial losses to the Appellants, including diminished CPNC values and lost profits.

The City filed a motion to dismiss the Appellants' amended complaint under OCGA § 9-11-12 (b) (6), arguing that the complaint failed to state a claim upon which relief could be granted. The City also asserted that the Appellants' claims were barred by sovereign immunity and that damages, if any, were limited to acts or omissions occurring within a four-year statute of limitation. The trial court summarily

5

granted the City's motion to dismiss without specifying the basis for its ruling, and the Appellants appeal from that dismissal.

The Appellants raise three enumerations of error: (1) their complaint stated a cause of action for breach of a franchise agreement as to Atlanta Metro Leasing's CPNCs; (2) their complaint stated a cause of action for breach of a franchise agreement as to Checker Cab's taxicab permit; and (3) their expenses of litigation claim was required to be reinstated with their breach of contract causes of action. As previously stated, the Appellants focus their appeal on whether the City's issuance of taxicab CPNCs and permits created municipal franchise agreements and, if so, whether the City breached any such agreements by failing to enforce taxicab regulations against TNCs. However, because "the applicability of sovereign immunity is a threshold determination, and, if it does apply, a court lacks jurisdiction over the case and, concomitantly, lacks authority to decide the merits of a claim that is barred[,]" we must first address the City's contention that sovereign immunity bars the Appellants' claims. (Footnote omitted.) *McConnell v. Dept. of Labor*, 302 Ga. 18, 19 (805 SE2d 79) (2017).[2]

---

[2] "For convenience of discussion, we have taken the enumerated errors out of the order in which [the Appellants have] listed them[.]" *Foster v. Morrison*, 177 Ga. App. 250 (1) (339 SE2d 307) (1985).

1. The Georgia Constitution provides broad sovereign immunity:

> Except as specifically provided in this Paragraph, sovereign immunity extends to the state and all of its departments and agencies. The sovereign immunity of the state and its departments and agencies can only be waived by an Act of the General Assembly which specifically provides that sovereign immunity is thereby waived and the extent of such waiver.

Ga. Const. of 1983, Art. I, Sec. II, Par. IX (e). This immunity, also known as governmental immunity, protects all levels of governments, including municipalities, from legal action unless they have waived their immunity from suit. See OCGA § 36-33-1 ("it is the public policy of the State of Georgia that there is no waiver of the sovereign immunity of municipal corporations of the state and such municipal corporations shall be immune from liability for damages"). "The authority to waive the immunity of municipalities rests solely with the General Assembly and must be effected by statute." (Citation omitted.) *Drumm v. George*, 345 Ga. App. 760, 762 (814 SE2d 575) (2018).

Significantly, our legislature has provided that "[m]unicipal corporations shall not be liable for failure to perform or for errors in performing their legislative or judicial powers." OCGA § 36-33-1 (b). This waiver has been consistently interpreted to mean that municipal corporations have sovereign immunity against claims

7

involving the performance, or failure to perform, "a governmental function[,] but may be liable for the negligent performance of their ministerial duties." (Citations omitted.) *City of Atlanta v. Mitcham*, 296 Ga. 576, 577-578 (1) (769 SE2d 320) (2015) ("municipal corporations are immune from liability for acts taken in performance of a governmental function"); see also *Albertson v. City of Jesup*, 312 Ga. App. 246, 249 (1) (718 SE2d 4) (2011) ("under Georgia law, municipal corporations shall not be liable for failure to perform or for errors in performing their legislative or judicial powers") (citations and punctuation omitted). The Georgia Supreme Court explained the difference between these two functions:

> Governmental functions traditionally have been defined as those of a purely public nature, intended for the benefit of the public at large, without pretense of private gain to the municipality. The exemption from liability for governmental functions is placed upon the ground that the service is performed by the corporation in obedience to an act of the legislature, is one in which the corporation has no particular interest and from which it derives no special benefit in its corporate capacity. Ministerial functions, in comparison, are recognized as those involving the exercise of some private franchise, or some franchise conferred upon the municipal corporation by law which it may exercise for the private profit or convenience of the corporation or for the convenience of its citizens alone, in which the general public has no interest.

(Citations, punctuation, and footnote omitted.) *Mitcham*, 296 Ga. at 578 (2). "The determination of whether a function is governmental or ministerial in character for

8

purposes of municipal sovereign immunity focuses broadly on the nature, purpose, and intended beneficiaries of the function performed by the municipal corporation." (Citations omitted.) Id. at 581-582 (2).

In this case, the City was operating in its legislative or judicial capacity, performing a governmental as opposed to ministerial function, when it determined that TNCs should not be held to the same regulations as taxicabs and stopped enforcing taxicab regulations against TNCs. See generally *Calloway v. City of Warner Robins*, 336 Ga. App. 714, 715-716 (1) (a) (783 SE2d 175) (2016) (a City's issuance of a permit or license is a governmental function); see also *Bond v. City of Royston*, 130 Ga. 646 (61 SE 491) (1908) (municipality not liable for enforcement of ordinance when acting in furtherance of a public function or duty); *Rivers v. City Council of Augusta*, 65 Ga. 376 (1880 Ga. LEXIS 204) (1880) (a city is not liable for damages in adopting an ordinance and subsequently repealing or suspending it). The Appellants argue that in refusing to enforce the ordinance against TNCs, the City intended the furtherance of its own private or pecuniary interests, exercising the City's private functions primarily for revenue and promotion of municipal welfare. However, "these allegations must be treated as mere conclusions of the pleader, no facts being alleged to show that the city was seeking 'the furtherance of its private or

pecuniary interests.'" *Bond*, 130 Ga. at 648. As in *Bond*, "[i]t does not appear that the municipality, as such, either was or could legally have been engaged in any business which the parties whom it is alleged the ordinance was intended to affect could have come into competition with." Id.

Moreover, although the City received revenue for the sale of CPNCs, "[w]hether the enterprise turns a profit, or only an incidental profit is not the controlling point; what is significant is the character of the [enterprise] as 'primarily a source of revenue' rather than being used primarily for the benefit of the public regardless of incidental generation of revenues." (Citation omitted.) *Atlanta v. Chambers*, 205 Ga. App. 834, 836 (2) (424 SE2d 19) (1992); see also *Cornelisen v. Atlanta*, 146 Ga. 416, 419 (91 SE 415) (1917) (public character of duties not affected by purely incidental profit from city's operation of park). As is more fully discussed in Division (1) (a) (ii), a review of the applicable ordinance demonstrates that obtaining a CPNC was a prerequisite to obtaining a business license and was required to promote public safety and convenience, not to provide the City with pecuniary gain. See Atlanta City Ordinance 162-56 (a); see also OCGA § 36-60-25 (a) (as originally enacted in 2007) (stating counties and cities "may" require taxicab owners to obtain a CPNC to operate and "may" require such owners to pay a regulatory fee).

10

In fact, the Appellants' argument is nonsensical since the City would have received more revenue by enforcing the applicable ordinance against TNCs.

In order to avoid the defense of sovereign immunity due to the exercise of the City's legislative or judicial powers, the Appellants have couched their claims as a breach of contract action against the City. The issue of whether there was a written contract is critical in this case because the Georgia Constitution provides for the waiver of sovereign immunity in cases involving written contracts: "The state's defense of sovereign immunity is hereby waived as to any action ex contractu for the breach of any written contract now existing or hereafter entered into by the state or its departments and agencies." Ga. Const. of 1983, Art. I, Sec. II, Par. IX (c); see also *Precise v. City of Rossville*, 261 Ga. 210, 211 (1) (403 SE2d 47) (1991) ("municipal immunity is not a valid defense to an action for breach of contract"). However, it is well established that, in the context of a contract action, sovereign immunity is waived only as to actions based on written contracts; an implied contract will not support a waiver of sovereign immunity. *Watts v. City of Dillard*, 294 Ga. App. 861, 863 (1) (670 SE2d 442) (2008); see also *Drumm*, 345 Ga. App. at 762. Likewise, sovereign immunity will generally bar not only unwritten contracts, but also "a lawsuit for damages upon quasi-contractual theories of liability in the absence of a

11

written contract." *Layer v. Barrow County*, 297 Ga. 871 (1) (778 SE2d 156) (2015). We, therefore, must determine whether the Appellants correctly assert that the City's issuance of taxicab CPNCs created valid written contracts or franchise agreements granting them freedom from competition from those not possessing a CPNC.

In this regard, Georgia law is clear:

> To constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate.

OCGA § 13-3-1. "A contract is not complete and enforceable until there is a meeting of the minds as to all essential terms." (Citation omitted.) *Drumm*, 345 Ga. App. at 762. "In order that it may allege an agreement, a petition must set forth a contract of such certainty and completeness that either party may have a right of action upon it." (Citation omitted.) *Weathers v. Dieniahmar Music, LLC*, 337 Ga. App. 816, 822 (2) (788 SE2d 852) (2016); see also *Laverson v. Macon Bibb County Hosp. Auth.*, 226 Ga. App. 761, 762 (487 SE2d 621) (1997).

The Appellants, as the parties seeking to benefit from the waiver of sovereign immunity, possessed the burden of establishing the existence of a valid written contract with the City and any resulting waiver of immunity. *Watts*, 294 Ga. App. at

12

863; see also *Williams v. Dept. of Corrections*, 338 Ga. App. 719, 720 (1) (791 SE2d 606) (2016). We conclude that they failed to do so in this case.

(a) The Appellants first assert that the City, by issuing CPNCs to Atlanta Metro Leasing under OCGA § 36-60-25 and Atlanta City Ordinance 162-62, entered into written franchise agreements with Atlanta Metro Leasing. According to the Appellants, these written franchise agreements included an implied promise by the City that it would support exclusivity and market value provisions by enforcing taxicab regulations and removing unlawful taxicabs from the streets, and, in fact, the City enforced these regulations before making a conscious decision not to require TNCs to comply with the regulations. The Appellants argue that by allowing TNCs to operate in the City without CPNCs, the City breached the franchise agreements by destroying the market exclusivity that CPNC owners formerly enjoyed, diminishing the market value of CPNCs, and decreasing their profits. There are multiple problems with this theory, and even when all of the Appellants' factual allegations in their amended complaint are accepted as true, the Appellants have failed to establish the existence of a valid, written contract which would waive the City's sovereign immunity.

13

(i) *Ability to contract*. We first must ascertain whether the City possessed the ability to enter into a contract or franchise agreement with Atlanta Metro Leasing. Central to this determination is whether a CPNC is characterized as a franchise or a license because a license is a permit, while "[a] franchise is a contract creating property rights." *City of Macon v. Alltel Communications*, 277 Ga. 823, 830 (596 SE2d 589) (2004). "The prevailing rule is that unless the power is expressly conferred by the legislature, a municipal corporation can not grant to any person, firm or corporation an exclusive privilege or monopoly." (Citations and punctuation omitted.) *Macon Ambulance Svc. v. Snow Properties*, 218 Ga. 262, 265 (2) (127 SE2d 598) (1962). We, thus, turn to the applicable statute and ordinance in this case.

OCGA § 36-34-2 (7) (A) gives municipalities

> [t]he power to grant franchises to or make contracts with railroads, street railways, or urban transportation companies, electric light or power companies, gas companies, steam-heat companies, telephone companies, water companies, and other public utilities for the use and occupancy of the streets of the city, for the purpose of rendering utility services, upon such conditions and for such time as the governing authority of the municipal corporation may deem wise and subject to the Constitution and the general laws of this state.

This statute has been construed as permitting a city to enter into franchise agreements with public service corporations, like utility companies. See *City of Summerville v.*

14

*Ga. Power Co.*, 205 Ga. 843, 844 (1) (55 SE2d 540) (1949) (statute authorizes a franchise "granted by a city council to a public-service corporation"). The Appellants apparently concede that taxicab companies do not fall within the ambit of "public service corporations;" however, they argue that such companies qualify as "urban transportation companies."

OCGA § 36-34-2 does not define "urban transportation companies," and the Appellants do not cite any statutes or cases defining this phrase or addressing a franchise given to such a company. Instead, the Appellants cite a number of older cases from foreign jurisdictions for the proposition that "franchises are a means for a municipality to authorize use of its roads and streets for transportation for hire services provided by private businesses." None of those cases, however, address a taxicab company. See *City and County of San Francisco v. Market Street R. Co.*, 73 P2d 234, 237 (Cal. 1937) (addressing whether street railway companies possessing franchises pursuant to specific statutes and charters were obligated to pay a license tax); *Jarrell v. Orlando Transit Co.*, 167 So. 664, 665-666, 667-668 (Fla. 1936) (affirming an order that enjoined a taxicab company from violating a franchise given by the City of Orlando to a bus company pursuant to a specific Act authorizing "an exclusive franchise for the use of the streets of the said city for the operation of

15

automobile busses[;]" the court distinguished taxicab companies that are designed for individual transportation and do not operate on fixed routes); *McCutcheon v. Wozencraft*, 255 SW 716, 718-719 (Tx. 1923) (reversing dismissal of mandamus action seeking to compel the City to allow electors to vote on a proposed ordinance to grant a franchise to a street railway enterprise employing busses to operate over the streets of the city because "[t]he [city] charter specifically gives the electors the right to grant or withhold franchises which appropriate portions of the street for the purpose of transportation for hire").

In fact, each of those cases addresses franchises given to companies providing a comprehensive system of transportation which would benefit the City and require large capital to create the designated routes, not companies designed for individual transportation that do not operate on fixed routes. For example, *McCutcheon*, 255 SW at 718-719, specifically stated,

> municipalities are generally given control over public thoroughfares within their territorial limits and in the exercise of this control a municipality has the right by ordinance to grant a license for conducting any lawful business upon the streets which would tend to public comfort or convenience and would not unreasonably impair the use of the streets for the purposes of their dedication. The granting of such a right by ordinance which could be exercised by anyone complying therewith would be an exercise of the police powers of the city. The right thus granted would ordinarily constitute a license and would be subject to

16

regulation and revocation by the city. There is a marked distinction, however, between the right thus granted and the right to use definite or designated portions of the public thoroughfares such as is acquired by street railways and water, light, heat, power, gas, steam and other similar enterprises, and this distinction is now well recognized in the jurisprudence of this country; the latter class of rights being very generally held to be franchises.

Because taxicabs do not use definite or designated portions of the public thoroughfares, but rather tend to offer public comfort and convenience, we agree with the City's characterization of its issuance of a CPNC as a license, subject to regulation and revocation by the City, rather than a franchise bestowed to an urban transportation company. See generally *Hadley v. City of Atlanta*, 232 Ga. App. 871, 872-874 (1) (502 SE2d 784) (1998) (annual renewal charge on CPNCs is a regulatory fee and not a tax because "it acts effectively as a precondition, or license, for engaging in the occupation").

The Appellants further cite Atlanta City Ordinance 1-102 (c) to support their contention that the City possessed the authority to enter into franchise agreements with Atlanta Metro Leasing. Section 1-102 (c) (10) gives the City express power

[t]o grant franchises or make contracts for public utilities and public services as provided by law. The council may prescribe the rates, fares, regulations, and standards and conditions of service applicable to the service to be provided by the franchise grantee or contractor, insofar as not in conflict with such regulations by the Public Service Commission,

17

and may grant franchises and rights-of-way throughout the streets and roads. . . .

The Appellants argue that the use of the word "fares" "demonstrate[s] clearly that transportation related franchises were expressly authorized under this charter section." While we agree with this assertion, we disagree with the Appellants' implication that taxicab companies constitute "public utilities and public services." As stated above, such entities generally encompass companies providing comprehensive systems for the benefit of the City, not companies, such as Atlanta Metro Leasing, that provide benefit to limited individuals and do not operate on fixed routes.

In addition, Atlanta City Ordinance Section 1-102 (c) (2) empowers the City to *license and regulate* "privileges, occupations, trades, and professions and to provide for the manner and method of payment of such licenses and taxes[.]" Likewise, Section 1-102 (c) (36) empowers the City to *license and regulate* "vehicles operated for hire in the city" and "to limit the number of such vehicles[.]" Thus, the ordinance language supports our conclusion that the issuance of a CPNC is a license, rather than a franchise.

The appellants argue that because a franchise is a contract creating property rights, see *Macon Ambulance Svc.*, 218 Ga. at 265 (2), and because Georgia law recognizes property interests in CPNCs, a CPNC is properly classified as a franchise rather than a license. Indeed, OCGA § 36-60-25 (b), as originally enacted in 2007, stated as follows:

> Each certificate of public necessity and convenience or medallion issued at any time by a county or municipal corporation shall be fully transferable pursuant to a purchase, gift, bequest, or acquisition of the stock or assets of a corporation to any person otherwise meeting the requirements of the applicable local ordinance. Each such certificate of public necessity and convenience or medallion may be used as collateral to secure a loan and each lending institution making such a loan shall have all rights of secured parties with respect to such loan.

Although the statute was amended in 2015, the amendment did not alter the ability to transfer a CPNC or use a CPNC as collateral to secure a loan. The City of Atlanta likewise recognizes certain property rights intrinsic to CPNCs. Sections 162-62 (a), (d), and (e) of the City of Atlanta Vehicle for Hire Ordinance provide for the transferability of CPNCs through bequests and the pledging of such instruments as collateral for loans. Thus, there are property interests inherent in CPNCs. See generally *Atlanta Taxicab Co. Owners Assn. v. City of Atlanta*, 281 Ga. 342, 343-347 (2) (638 SE2d 307) (2006) (finding that the one-year Georgia residency requirement

19

to qualify for a CPNC violated the Commerce Clause of the United States Constitution because the ordinance served "as an immediate infringement on the property rights enjoyed by all members of the Association" to sell or lease a CPNC to a non-Georgian).

However, although CPNC owners are able to transfer their CPNCs and use them as collateral for certain loans, thus contributing to the development of a secondary market wherein CPNCs historically have attained significant value, that does not change the fact that taxicab companies are not "public utilities and public services" with which the City may enter into franchise agreements. Contrary to the Appellants' argument, the City's issuance of a CPNC does not constitute a franchise agreement; "CPNC holders merely possess a license to participate in the highly regulated taxicab market that is subject to regulatory change." (Citation and punctuation omitted.) *Dennis Melancon, Inc. v. City of New Orleans*, 703 F3d 262, 273 (III) (A) (4) (5th Cir. 2012); see also *Macon Ambulance Svc.*, 218 Ga. at 266 (2) ("the operation of vehicles for hire on the city streets is a privilege rather than a right, with the privilege being withheld or bestowed as the governing authorities of the municipality see fit to reasonably regulate their use under the police power for the welfare and protection of the general public"); *Associated Cab Co. v. City of Atlanta*,

20

204 Ga. 591, 593 (50 SE2d 601) (1948) ("[t]he transportation of passengers for hire in a taxicab upon the streets of a city is not an inherent right, but a privilege which the municipality, in the exercise of its discretion, may grant or refuse") (citation and punctuation omitted); *Delta Cab Assn. v. City of Atlanta*, 44 FSupp3d 1243, 1246 (III) (B) (N.D. Ga. 2014) (Atlanta's "regulatory scheme for taxicab permitting is rationally related to a legitimate municipal objective" and ordinance requirements serve legitimate governmental interests).

Despite the property rights inherent in CPNCs, we conclude that a CPNC is better characterized as a license, rather than a franchise. We further conclude that neither OCGA § 36-34-2 nor Atlanta City Ordinance 1-102 authorized the City to enter into franchise agreements with Atlanta Metro Leasing through the issuance of CPNCs.

(ii) *Creation of any alleged contract*. Even if this Court were to find that the City was authorized to enter into franchise agreements with Atlanta Metro Leasing through the issuance of CPNCs, "the *authority* to enter into such agreements does not mean that there is a franchise agreement between the City and [Atlanta Metro Leasing]." (Emphasis supplied.) *City of LaGrange v. Troup County Elec. Membership Corp.*, 200 Ga. App. 418, 420 (1) (408 SE2d 708) (1991). We must determine

21

whether the language of the applicable statute and City ordinances created a contractual agreement and whether the City assented to the creation of such a contractual agreement when it issued the CPNCs. It is well settled that statutes and ordinances generally do not create contracts. As the United States Supreme Court has noted,

> the principal function of a legislature is not to make contracts, but to make laws that establish the policy of the state. Policies, unlike contracts, are inherently subject to revision and repeal, and to construe laws as contracts when the obligation is not clearly and unequivocally expressed would be to limit drastically the essential powers of a legislative body.

(Citation omitted.) *Nat. R. Passenger Corp. v. Atchison, Topeka & Santa Fe R. Co.*, 470 U. S. 451, 466 (II) (A) (105 SCt 1441, 84 LE2d 432) (1985). "Thus, the party asserting the creation of a contract must overcome this well-founded presumption, and we proceed cautiously both in identifying a contract within the language of a regulatory statute and in defining the contours of any contractual obligation." (Citation omitted.) Id.

The first step in determining whether a statute or ordinance gives rise to a contractual obligation is to examine the language of the statute or ordinance. *Nat. R. Passenger Corp.*, 470 U. S. at 466 (II) (A). Absent expression of an actual intent of

the City to bind itself, the statute or regulation is "undoubtedly a scheme of public regulation" rather than a private contract to which the City is a party. Id. 466-467 (II) (A). We thus turn to the statute and City ordinances at issue to ascertain whether the language employed in those laws, and the City's issuance of CPNCs pursuant to those laws, created a franchise agreement between the City and Atlanta Metro Leasing.

OCGA § 36-60-25 (a), as originally enacted in 2007, stated as follows:

Each county and municipal corporation may require the owner or operator of a taxicab or vehicle for hire to obtain a certificate of public necessity and convenience or medallion in order to operate such taxicab or vehicle for hire within the unincorporated areas of the county or within the corporate limits of the municipal corporation, respectively, and may exercise its authority under Code Section 48-13-9 to require such owners or operators to pay a regulatory fee to the county or municipal corporation. The General Assembly finds and declares that any county or municipality exercising the powers granted in this Code section is legitimately concerned with the qualifications and records of drivers of taxicabs and other vehicles for hire; with the location, accessibility, and insured state of companies operating taxicabs and other vehicles for hire; and with the safety and comfort of taxicabs and other vehicles for hire. Without limitation, each such county or municipality may exercise the powers granted in this Code section by ordinance to the same extent as the ordinances reviewed by the Georgia Court of Appeals in the case of *Hadley v. City of Atlanta*, 232 Ga. App. 871, 875 (1998), and each certificate of public convenience and necessity issued under those ordinances shall remain in full force and effect.

23

This language does not manifest a clear and unequivocal expression of an actual intent that a municipality binds itself to or contracts with taxicab companies by issuing CPNCs. In fact, the statute specifically uses permissive "may" language and states that CPNCs are required to promote public safety and convenience, not to confer specific property interests to CPNC owners or create franchise agreements with the City.

The City Ordinance language likewise does not manifest a clear and unequivocal expression of an actual intent on the part of the City to bind itself contractually to taxicab companies. Atlanta City Ordinance 162-56 (a) states:

> No vehicle for hire shall be operated on the highways of the city until its owner or lessee has obtained for such vehicle a valid certificate of public necessity and convenience, and until the company with which it is affiliated has obtained a business license from the city. No such business license shall be issued until the CPNC and company permits have been issued by the department.

The plain language of this ordinance specifically refers to a CPNC as a prerequisite to obtaining a "business license," rather than a contractual or franchise agreement. As our Georgia Supreme Court made clear, "[h]olders of a CPNC must comply with Chapter 162 of the City Code, pursuant to the provisions of which the City regulates the taxicab industry." *Atlanta Taxicab Co. Owners Assn.*, 281 Ga. at 342. Although

24

Atlanta City Ordinance 162-61 (a)'s limitations on the number of taxicab CPNCs issued by the City has the effect of limiting the number of taxicab drivers, it does not create a franchise or impose exclusivity within the taxicab industry. See generally *Dennis Melancon, Inc.*, 703 F3d at 273 (III) (A) (4) (finding that ability to limit number of CPNCs "evidences that CPNCs are issued for the purpose of promoting the public convenience and necessity, and not for the purpose of conferring upon the holder any proprietary interest") (citation and punctuation omitted).

Here, the Appellants can point to no language in either the statute or City ordinances expressing a clear and unequivocal intent by the City to create a contractual commitment; thus, the Appellants cannot establish that the City assented to any contract under OCGA § 13-3-1. The Appellants likewise refer to no case law to support their contention that the laws, or the issuance of the CPNCs pursuant to those laws, created a contractual or franchise agreement. In addition, unlike contractual obligations, the terms of OCGA § 36-60-25 and the Atlanta City Ordinances, which govern the rights conferred by CPNCs, can be modified, amended, or repealed unilaterally by the State or City at any time without the assent of taxicab CPNC owners, thus defeating the notion that by issuing CPNCs the City entered into binding agreements promising perpetual exclusivity in the for hire transportation

market. See *City of LaGrange*, 200 Ga. App. at 419-420 (1) (a license, as opposed to a franchise, is not a contract and may be abrogated). The Appellants, at best, had a unilateral expectation that the City would enforce the regulations and would not diminish the market value of the CPNCs, not the mutual assent required to create a binding contractual obligation.

Moreover, the Appellants' argument that a question of fact exists as to whether the City intended its ordinances to create private contractual rights is unpersuasive. First, as stated previously, unless the regulations specifically express an actual intent of the City to bind itself and assent to a contract, the statute or regulations are "undoubtedly a scheme of public regulation" rather than a private contract to which the City is a party. *Nat. R. Passenger Corp.*, 470 U. S. at 467 (II) (A). No such language is included in the statute or ordinances at issue in this case.

In addition, as the Appellants point out, only a handful of cases have discussed contractual obligations in the context of taxicab CPNCs or permits, and all of them have found that City regulations did not create binding contractual obligations. See, e.g., *Joe Sanfelippo Cabs v. City of Milwaukee*, 839 F3d 613, 616 (7th Cir. 2016) (rejecting breach of contract claim regarding taxicab permits because "ordinances are not contracts, let alone perpetual contracts" and the City did not promise never to

26

rescind or amend the ordinance, so taxicab companies had no reason to believe the ordinance would continue perpetually); *Newark Cab Assn. v. City of Newark*, 235 FSupp3d 638, 647 (III) (A) (D. N. J. 2017) (dismissing breach of contract claim because taxicab companies failed to demonstrate that language in City regulations created a contractual obligation to support exclusivity and medallion market values by removing unlawful taxicabs from streets); *Boston Taxi Owners Assn. v. City of Boston*, 180 FSupp3d 108, 119-120 (II) (b) (3) (D. Mass. 2016) (holding that breach of contract suit claiming the City destroyed market exclusivity owned by medallion holders failed to state a claim upon which relief could be granted because applicable laws and regulations were not bilateral agreements and there was no promise of exclusivity for medallion holders).[3] We find the analyses in these cases compelling.

In conclusion, the terms of the applicable statute and ordinances in this case demonstrate that no written contract or franchise agreement between the City and Atlanta Metro Leasing was created when the City issued CPNCs to the company. "Under these circumstances, we simply cannot say that [the Appellants] met [their] burden of proving the essential elements of a written contractual agreement between

[3] Although the parties have exhaustively discussed exclusivity and breach of contract in their briefs, we cannot address those issues given the applicability of sovereign immunity and our lack of jurisdiction.

[Atlanta Metro Leasing] and the City sufficient to support [its] breach of contract claim or the City's waiver of the immunity defense." *Watts*, 294 Ga. App. at 863-864. Because there has been no waiver of the City's sovereign immunity in this case, the trial court lacked subject matter jurisdiction to consider Atlanta Metro Leasing's breach of contract claim based on the City's issuance of CPNCs, and we affirm the court's dismissal of that claim.

(b) The Appellants next assert that because taxicab permits "are interwoven with CPNCs, these permits are appropriately defined as a franchise." The gravamen of the Appellants' argument is that taxicab company operations were only authorized if CPNCs were amassed at a certain threshold; thus, "CPNCs were integrally interwoven into taxicab company permits in a way that demands an intellectual conclusion that these permits are franchises in substance." Based on our conclusion in Division (1) (a) that the issuance of CPNCs did not create written franchise agreements between the City and Atlanta Metro Leasing, sovereign immunity also bars the Appellants' breach of contract claim regarding taxicab permits, and the trial court correctly dismissed that claim.

2. Based on our holding in Division 1, the Appellants' expenses of litigation claim need not be reinstated. See *Home Depot U.S.A. v. Wabash Natl. Corp.*, 314 Ga.

28

App. 360, 374 (7) (724 SE2d 53) (2012) (holding that expenses of litigation cannot be recovered if appellant does not prevail on its underlying substantive claims).

*Judgment affirmed. Dillard, P. J., and Gobeil, J., concur*.